UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

IN RE )
) Bankruptcy Case
MELVIN WAYNE COOPER and ) No. 10-66447-fra12
JODONNA ANNE COOPER, )
) MEMORANDUM OPINION[1]
Debtors. )

Debtors-in-Possession, Jodonna and Melvin Cooper (DIPs) filed their Chapter 12 petition on October 27, 2010. The instant matter comes before the Court on Citizens Bank (Citizens) and JP Morgan Chase Bank's (Chase) objections to confirmation of DIPs' modified plan dated June 8, 2011 (the modified plan). The matter was heard on July 19, 2011. At that time, the Court invited written closing arguments, identifying several issues it wished the parties to discuss. The arguments have been submitted and the matter is ripe for decision. The Court's opinion will concentrate on two issues. The first centers on DIPs' eligibility to proceed in Chapter 12, the second on valuation of real property.

/ / / / / /

/ / / / / /

/ / / / / /

/ / / / / /

---

[1]This disposition is not intended for publication.

MEMORANDUM OPINION-1

Eligibility:

As noted, at the hearing, the Court had concerns about DIPs' eligibility to proceed in Chapter 12, and *sua sponte* invited briefing on the issue.[2]

Under 11 U.S.C. § 109(f) [3] "[o]nly a family farmer . . . may be a debtor under Chapter 12 . . . ." Section 101(18)(A) defines "family farmer" in relevant part as an "individual and spouse . . . engaged in a farming operation . . . [who] <u>receive from such farming operation</u> more than 50 percent of . . . such individual and spouse's gross income for- the taxable year preceding . . . or each of the 2d and 3d taxable years preceding . . . the taxable year in which the case . . . was filed." (emphasis added). DIPs have the burden to prove eligibility. <u>In re Powers</u>, 2011 WL 3663948, *1 (Bankr. N.D. Cal. 2011). Because DIPs filed their Chapter 12 petition in October, 2010, for purposes of the gross income requirement, the Court looks to DIPs' income figures for 2009, or alternatively for 2008 and 2007. In arguing they meet the gross income requirement, DIPs point to their Exhibit D-1's ("Financial Review of Farming Business") filed earlier in the case. DIPs' written Closing Argument at 4:9-12 (Docket #61). Those Exhibits contain no information relating to DIPs' 2007 or 2008 operations. DIPs thus rely solely on their 2009 operations to qualify. In that year, they operated 3 businesses through wholly owned limited liability companies and have filed separate Exhibit D-1's for each.[4]

---

[2] It is axiomatic that eligibility is a threshold requirement to confirming a reorganization plan. § 1225(a)(1) (the plan must comply "with the provisions of this chapter and with the other applicable provisions of this title." The court may thus *sua sponte* raise eligibility as an issue. <u>In re Berenato</u>, 226 B.R. 819, 823 (Bankr. E.D. Pa. 1998).

[3] Unless otherwise noted, all subsequent statutory references are to Title 11 of the United States Code.

[4] Courts in general have used the federal tax definition of "gross income" for purposes of § 101(18)(A). <u>See, e.g.</u>, <u>In re Lamb</u>, 209 B.R. 759, 760-61 (Bankr. M.D. Ga. 1997). No party in interest argues this Court should do otherwise. Unless its members elect otherwise, (here there is no indication of such an election), for federal tax purposes, income from limited liability companies with two or more members, as here, is treated as partnership income for tax purposes. 26 C.F.R. § 301.7701-3(b)(i); <u>Gregg v. U.S.</u>, 186 F. Supp.2d 1123, 1126 (D. Or. 2000). In turn, a partnership's gross income "passes through" to the distributive shares of the individual partners, or here "LLC" members. 26 U.S.C. § 702(c); <u>see also</u>, <u>Lamb</u>, 209 B.R. at 761 (distributive share of partnership's gross income counted for each partner for § 101(18)(A) purposes). Because DIPs were the sole members of their limited liability
(continued...)

MEMORANDUM OPINION-2

The first business was a vineyard operated as "Shadow Mountain Vineyards LLC" (**SMV**).[5] SMV's Exhibit D-1 reflects $141,465 in gross 2009 income. The second, "Shadow Mountain Tree Farms LLC" (SMTF) grew Christmas trees on leased land and sold them on the wholesale and retail markets. SMTF's Exhibit D-1 indicates $375,492 in 2009 gross income. The third, "Valley View Christmas Trees LLC" (VVCT) was also a Christmas tree business. However instead of growing the trees, VVCT purchased mature trees from third parties and sold them mainly on the retail market at locations in Arizona. VVCT grossed $1,122,576 in 2009. There is no dispute that SMV and SMTF were engaged in farming operations. However, the gross income from these two companies totaled only 31.5% of DIPs' total gross 2009 income. The question then becomes whether VVCT's operations qualified as a "farming operation" for eligibility purposes.

Under § 101(21), a "farming operation" "includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." This list is not exclusive. § 102(3)(the term "includes" is not limiting). Given Chapter 12's remedial purposes, "farming operation" is to be broadly construed, In re Sugar Pine Ranch, 100 B.R. 28, 31 (Bankr. D. Or. 1989), but not so broadly "so as to eliminate the definition altogether by bringing in operations clearly outside the nature or practices one normally associates with farming." In re Cluck, 101 B.R. 691, 695 (Bankr. E.D. Okla. 1989)(internal quotation omitted). This District uses a "totality of the circumstances" test to determine whether a Chapter 12 debtor is engaged in a "farming operation." Sugar Pine Ranch, 100 B.R. at 31. Some of the factors to be considered are:

> 1. Whether the location of the operation would be considered a traditional farm;
> 2. The nature of the enterprise at the location;
> 3. The type of product and its eventual market;
> 4. The physical presence or absence of family members on the farm;
> 5. Ownership of traditional farm assets;

---

[4](...continued)
companies, all of those companies' gross incomes will be attributed to DIPs for purposes of the 50% gross income requirement.

[5]SMV's operations are described in more detail in the "Valuation" section below.

MEMORANDUM OPINION-3

> 6. Whether the debtor is involved in the process of growing or developing crops or livestock; and
> 7. Perhaps the key factor is whether or not the practice or operation is subject to the inherent risks of farming.

Id. (internal citations and quotations omitted). Under the Sugar Pine Ranch test, VVCT's retailing of Christmas trees purchased from third parties[6] does not constitute a "farming operation." The company did not cultivate the trees; it merely marketed them. Any inherent farming risk, such as disease, weather, market fluctuations in seedling costs, etc. were at most "indirect." See, In re Jones, 2011 WL 3320504, *3 (Bankr. D. Or. 2011) (fixed fees for horse boarding and related activities were only indirectly tied to farming risks). As one court succinctly stated: "The mere purchase and sale of farm by-products is not necessarily a 'farming operation.'" Federal Land Bank of Columbia v. McNeal (In re McNeal), 848 F.2d 170, 172 (11th Cir. 1988).[7] Were it otherwise, the corner vegetable/fruit market or butcher would qualify for Chapter 12 relief. This is clearly not what Congress intended. DIPs are thus ineligible for Chapter 12 relief.

Valuation:

DIPs own two 20.4 acre parcels of land in rural Lane County, Oregon (the north and south parcel, respectively). They reside in a modern 4-bedroom, 3,658 square foot home on the south parcel. Up until the time of filing, SMV operated both parcels as a vineyard. Chase holds a note and first position trust deed on the south parcel. It has filed a secured proof of claim for $749,172.06. Citizens holds a note and amongst other security, second position trust deed on the south parcel and first position trust deed on the north parcel. It has filed a proof of claim for $1,300,000 secured, and $23,938.05 general unsecured. In the

/ / / / / /
/ / / / / /

---

[6] There is no evidence as to whether any of SMTF's trees were part of VVCT's inventory, and if so, how many. The inference is none, as both companies reported their own sales/income figures. Even assuming *arguendo* that VVCT sold some of SMTF's trees, it would be pure speculation to find that those sales pushed gross revenues (from DIPs' own trees) past the aggregate 50% mark. Again, DIPs have the burden of proving eligibility.

[7] See also, In re Dakota Lay'd Eggs, 57 B.R. 648, 656 (Bankr. D.N.D. 1986) (portion of debtor's business which purchased eggs on the open market for resale was not a "farming operation").

MEMORANDUM OPINION-4

modified plan, DIPs propose to retain the south parcel, value it at $490,000, and "cram-down" Chase's secured claim to that value, which would leave no equity on the south parcel for Citizens' second trust deed.[8] The modified plan proposes to surrender the north parcel to Citizens. Both Chase and Citizens objected to DIPs' valuation of the south parcel.

Under § 1225(a)(5)(B), a Chapter 12 debtor-in-possession may treat a secured claim by paying the "allowed amount of such claim" as of the plan's effective date. The "allowed amount" of a secured claim, at least when valuation of collateral is the issue, is governed by § 506(a), which defines a secured claim as the value of the creditor's interest in the estate's interest in the collateral. When the collateral's value is less than the debt owed against it, the amount of the secured claim is fixed at the collateral's value. Under § 506(a), value is to be determined "in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing . . . on a plan affecting such creditor's interest." Where property is being retained as proposed here, it is to be valued at "fair market value" without regard to liquidation costs. In re Mikkelsen Farms, Inc., 74 B.R. 280, 292 (Bankr. D. Or. 1987). At the confirmation hearing, Mr. Cooper testified that of the 20.4 south parcel acres, 8.6 were producing grapes (4.2 in pinot noir and 4.4 in pinot gris), while an additional 3.2 had just been planted and were in their bud stage. The remainder of the acreage contains the homestead, roads, a pond, a creek, and land not suitable for planting grapes.

DIPs and Citizens each presented expert appraisal testimony. DIPs' appraiser valued the south parcel at $525,000. He then subtracted approximately $37,000 in deferred maintenance to reach a $488,000 net valuation. In stark contrast, Citizens' appraisers valued the south parcel at $820,000. DIPs' appraisal was premised on the assumption the south parcel would be used for residential purposes, with the grapevines and trellises as "landscaping," and with the vineyard operated as a "hobby farm." Citizens' appraisal was more comprehensive and was premised on the south parcel being used as a "part-time" vineyard farm. Mr. Cooper testified he will continue to cultivate and harvest the 8.6 producing acres as well as nurse the just-planted 3.2

---

[8] DIPs propose to pay Chase's secured claim on a 30 year amortization at 4.25% interest, in monthly instalments of $2,410.51, with the first 36 instalments paid by the Chapter 12 Trustee.

MEMORANDUM OPINION-5

acres to maturity. Cultivating, harvesting, marketing and selling 11.8 acres of grapes seems less of a hobby and more like a "part-time" occupation, as assumed by Citizens' appraisal. Further, Mr. Cooper's own projections belie mere "hobby" status. SMV's Exhibit D-1 projects $112,000 in gross annual income and $129,718 in expenses, both significant amounts. The grapes are being worked. They deserve to be valued as more than just amenities. Citizens' appraisal is thus more reliable. It rightly presumes a highest and best use as a "part-time" vineyard, which in fact tracks DIPs' intended use. Consistent with that use, it values the planted acreage as a producing vineyard, rather than relegating it to "amenity" or "landscaping" status. It uses "vineyard" (many with home-sites) comparables as opposed to "rural residential" comparables used in DIPs' appraisal. Finally, it was performed by two experienced farm appraisers, while DIPs' appraiser had no experience valuing agricultural properties. However, because DIPs cannot go forward in Chapter 12, the Court need not at this juncture determine the south parcel's exact value. It is sufficient to conclude that DIPs' value is too low to be confirmable.

  Based on the above, confirmation of the modified plan is denied. An order will be entered 14 days from entry of this opinion dismissing the case unless in the interim DIPs elect to convert to another chapter. The above constitute the Court's findings of fact and conclusions of law under FRBP 7052. They shall not be separately stated.

FRANK R. ALLEY, III
Chief Bankruptcy Judge

MEMORANDUM OPINION-6